IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| NUTRIEN AG SOLUTIONS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:25-cv-469 |
| | ) | |
| MEHERRIN AGRICULTURAL & CHEMICAL COMPANY, and WILLIAM PATRICK TAYLOR | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Lindsey A. Freeman, United States District Judge.

Plaintiff, Nutrien AG Solutions, Inc. ("Nutrien"), alleges that its former employee, Defendant William Patrick Taylor ("Taylor"), while with Nutrien and prior to leaving to work for Defendant Meherrin Agricultural & Chemical Company ("Meherrin") (together, "Defendants"), manipulated a lease agreement with a third party to Nutrien's detriment and Meherrin's future advantage, downloaded confidential Nutrien documents to take with him when he left, and factory wiped his Nutrien work devices. Nutrien further alleges that after starting with Meherrin, Taylor used sensitive Nutrien pricing information to undercut Nutrien pricing with a potential customer.

Nutrien brings multiple causes of action related to these allegations: breach of contract against Taylor (Count One), misappropriation of trade secrets under federal and

North Carolina law against Taylor and Meherrin (Counts Two and Three, respectively), tortious interference with contractual relations against Meherrin – employee agreements (Count Four), tortious interference with current and prospective economic advantage – customer contracts (Count Five), tortious interference with contractual relations against Taylor and Meherrin – lease agreement (Count Six), unjust enrichment against Meherrin (Count Seven), unfair and deceptive trade practices against Meherrin and Taylor (Counts Eight and Nine, respectively), and common law conspiracy against Taylor and Meherrin (Count Ten).

Nutrien seeks damages, recovery of Defendants' alleged ill-gotten gains, preliminary and permanent injunctive relief barring Meherrin from using any of its trade secret information, and punitive damages. *See* Dkt. 1 (hereinafter "Compl.").

Before the Court is the Defendants' Motion to Dismiss Counts Two through Ten. For the reasons set forth, the Court denies the motion as to all claims arising from Counts Two, Three, Four, Six, Seven, Eight, Nine, and Ten. The Court grants the motion as to any claims arising out of Count Five.

## FACTS AND PROCEDURAL HISTORY

Because all well-pleaded facts are accepted as true and considered in the light most favorable to the plaintiff, below are the facts as Nutrien has alleged in the Complaint, Dkt. 1. *See Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009).

## I. Background on Nutrien

Nutrien is the retail division of Nutrien Ltd., a crop inputs company. *See* Compl. ¶ 10. Nutrien provides agricultural products and services through a network of trusted crop consultants, helping growers to maximize their yields using customized solutions and a variety of products, including seed, nutrition, and crop protection. *See id*.

Nutrien has developed various products, techniques, strategies, methodologies, lists, and other confidential documents and information (the "Confidential Information") over a period of many years, constituting significant effort, goodwill, research, and expense. *See id*. ¶ 11.

Nutrien does not sell or otherwise provide the Confidential Information to third parties and protects it by limiting access to those employees who need it to perform their duties. *See id*. ¶ 12. Nutrien guards the Confidential Information by using password protection, training employees on the need to protect confidentiality, and requiring employees with access to agree not to use it for personal gain. *See id*. Nutrien further requires employees with access to agree not to use or disclose any of the Confidential Information except for the benefit of the company before or after their employment with Nutrien. *See id*. The Confidential Information includes valuable trade secrets that Nutrien keeps secret because they are not publicly known and not readily ascertainable by competitors. *See id*. ¶ 13.

## II. Nutrien Employs Taylor

Nutrien hired Taylor in November 2018. *See id.* ¶ 14. He worked as a crop consultant for more than six years before resigning on December 18, 2024. *See id.* ¶¶ 14, 19. As a condition of his employment, Taylor and Nutrien entered into a Conflicts of Interest Agreement on November 12, 2018. *See id.* ¶ 15, Ex. A. That agreement required Taylor to avoid conflicts of interest, such as "[a]ny services performed either directly or indirectly, by directive, managerial, or consultative nature for any enterprise or company;" "[a]ny services performed either directly or indirectly for compensation for any enterprise or company that may require the use of [Nutrien] equipment or labor [that] is performed during normal working hours;" and "[d]irect or indirect competition with [Nutrien] . . . in the purchase, sale or lease of rights in real property." *See id.*

On that same day, Nutrien and Taylor entered into a Confidentiality Agreement, wherein Taylor agreed:

> Not to use on [his] own behalf or on behalf of others, nor to publish or divulge to others, during the period of [his] employment to at any time thereafter, any trade secrets or confidential information, processes, plans, inventions, knowledge or data of [Nutrien] or any of its subsidiaries, obtained by [him] as a result of or during [his] employment, unless authorized in writing to do so by [Nutrien].

*See id.* ¶ 17, Ex. B.

## III. The Millingport Road Property

For nearly two decades, Nutrien leased property at 32467 Millingport Road in Albemarle, North Carolina ("Millingport Road Property") from Joseph W. Lippard

Family, LLC ("Millingport Road Property Landlord" or "Landlord"). *See id*. ¶ 20. At the time that Nutrien first began leasing the property, Joseph Lippard owned and operated Joseph W. Lippard Family, LLC. *See id*. ¶ 21.

Nutrien alleges that, in or around 2015, Joseph Lippard's nephew, Norman Morgan, took over certain operations of Joseph W. Lippard Family, LLC related to the leased property. *See id*. ¶ 22. It was typical for Nutrien to lease the property in three-year terms. *See id*. ¶ 23. Under these lease agreements, Nutrien was also permitted to, "at its own cost and expense . . . make such alterations, additions or improvements or erect, remove or alter such partitions, or erect such racks, shelves, bins, machinery and trade fixtures as it may deem advisable without the consent of the Landlord." *See id*. ¶ 24, Ex. C. All "alterations, additions, improvements and partitions installed by [Nutrien]" would be Nutrien's property and could be "removed or abandoned by [Nutrien] at the expiration of the Term." *See id*.

When Nutrien began leasing the property, it consisted of a single building that functioned as Nutrien's office. *See id*. ¶ 25. Throughout the life of its tenancy, Nutrien made extensive improvements to the property, including adding and expanding buildings and installing specialized storage equipment. *See id*.

In or around November 2019, Nutrien and Morgan engaged in negotiations regarding renewal of the lease agreement; during those negotiations, Nutrien described the improvements it had made to the property. *See id*. ¶ 26. Morgan acknowledged those

improvements and agreed to a modest increase in the rent for an additional three-year term from January 1, 2020, through December 31, 2022. *See id.*, Ex. C. This agreement also called for an automatic one-year renewal under the same terms, conditions, and rent. *See id.* ¶ 27, Ex. C. Thus, the agreement renewed for the period from January 1, 2023, through December 31, 2023. *See id.*

In or around November 2023, when the agreement was due to expire, Nutrien's internal system alerted certain employees that the property lease was due for renewal. *See id.* ¶ 28. Taylor received this notification; Ben Hawkinson, the Nutrien Division Manager for North and South Carolina, did not. *See id.* ¶ 29.

Nutrien alleges that Taylor contacted Morgan directly regarding the 2024 through 2027 lease agreement and told Nutrien's internal team that Morgan asked that the lease be reduced to a one-year lease term. *See id.* ¶ 30. This prompted Nutrien to enter into a new lease agreement for the property on December 27, 2023, for a term starting January 1, 2024, and ending on December 31, 2024. *See id.* ¶ 31, Ex. D. Taylor negotiated this lease agreement purportedly on behalf of Nutrien. *See id.* ¶ 32.

In November 2024, approximately a month before the lease agreement expired, Nutrien invested $25,000 in property improvements. *See id.* ¶ 33. Nutrien avers in its Complaint that it would not have made these investments had it known that Morgan would terminate the lease one month later. *Id.*

On December 12, 2024, Morgan emailed Taylor, advising that the company would not be renewing Nutrien's lease for the property and that it had agreed to lease the property to Meherrin, starting January 1, 2025. *See id.* ¶ 34. That same day, Taylor told Hawkinson that Morgan was not renewing the lease. *See id.* ¶ 35. Hawkinson then called Morgan and asked if Nutrien could have time before the lease's expiration on December 31, 2024, to remove its property. *See id.* ¶ 36. Nutrien alleges that Morgan told Hawkinson that Nutrien would have to ask the new tenant (Meherrin) whether Nutrien could extend its lease to remove its equipment, improvements, and additions from the property. *See id.*

Shortly after that, Meherrin employee Eddie Price called Hawkinson and asked why Nutrien needed more time to vacate the premises and why Nutrien was removing equipment, improvements, and inventory, given the cost to remove them. *See id.* ¶¶ 37-38. Price suggested that, in giving Nutrien so little time to move, Meherrin would be able to take over Nutrien's improvements, equipment, and inventory for the benefit of Meherrin's agricultural retail business. *See id.* ¶ 38. Meherrin ultimately did not allow Nutrien additional time to remove its property and improvement from the premises. *See id.* ¶ 39. As a result, Nutrien expended significant costs and efforts to remove its property, equipment, and improvements before the lease expired on December 31, 2024. *See id.* ¶ 40. However, some of the improvements could not be removed in time and were left behind. *Id.* ¶ 117.

Nutrien alleges that Morgan, Taylor, and Meherrin personally conspired and colluded to block the renewal of Nutrien's lease in the hopes that Nutrien would not have sufficient time to remove its equipment and property from the premises and Meherrin could thus acquire it. *See id.* ¶ 41.

## IV. Taylor's Access to Nutrien's Confidential Information

While working as a crop consultant for Nutrien, Taylor had access to Nutrien's Confidential Information, including Nutrien's proprietary seed products, its recommended nutrition and protection, its grower management tools, its customer lists, its pricing strategies, its supplier data, its business plans, its marketing plans, and other sensitive business information. *See id.* ¶ 42.

In the days leading up to Taylor's resignation, including the hours leading up thereto, he downloaded multiple confidential Nutrien documents to take with him to his new employer, Meherrin. *See id.* ¶ 43. Those documents contained highly sensitive information and trade secrets concerning nearly every aspect of Nutrien's business, including customer lists, pricing guidelines, sales reports, and quote and order tracking logs. *See id.* ¶ 44. Nutrien alleges that Taylor planned to use these documents in furtherance of his shared scheme with Meherrin to steal Nutrien's business and enable Meherrin's unfair competition against Nutrien. *See id.* ¶ 45.

Nutrien further alleges that the misappropriated documents would allow Taylor and Meherrin to duplicate its business processes, products, and services unfairly and

with little effort. *See id.* ¶ 46. According to Nutrien, Taylor had no reason to make copies of these documents shortly before his departure from the company but for his own personal benefit and that of his new employer, Meherrin. *See id.* ¶ 47. Nutrien alleges that Taylor, currently employed by Meherrin, is using the misappropriated documents for his own benefit and that of his employer. *See id.* ¶ 49. Nutrien further alleges that Meherrin personnel knew Taylor took Nutrien's Confidential Information when he left the company, and they have not acted to avoid or prevent the use of that information. *See id.* ¶ 50.

Six days before he resigned from Nutrien, Taylor downloaded a copy of a Nutrien spreadsheet entitled "2025 Default Price List and Info.xlsx." *See id.* ¶ 51. That spreadsheet contained the pricing information for all of Nutrien's customers at the Millingport branch for 2025. *See id.* Nutrien alleges that Meherrin has contacted at least one customer on that list, with whom Meherrin had not previously done business, and offered a price that undercut Nutrien's. *See id.* ¶ 51. This required Nutrien to discount its pricing even further to retain the customer, resulting in a loss. *See id.*

On December 27, 2024—nine days after Taylor resigned—the eight remaining Nutrien employees at the Millingport branch resigned from the company. *See id.* ¶¶ 19, 52. Nutrien alleges that seven of those individuals are now working for Meherrin doing the same kind of work that they did for Nutrien; the eighth person is on medical leave

but plans to join Meherrin once recovered. *See id.* ¶ 53. According to Nutrien, Taylor and Meherrin personnel organized the departure of these eight employees. *See id.* ¶ 54.

## V. Nutrien Warns Meherrin and Taylor

On April 3, 2025, Nutrien sent Meherrin a letter warning Meherrin not to use Nutrien's trade secrets and proprietary information. *See id.* ¶ 55. In the letter, Nutrien asked Meherrin to identify all Nutrien documents and information it received from Taylor regarding Nutrien's business. *See id.*, Ex. F. Six days later, Nutrien sent Taylor a letter reminding him of his obligation not to disclose or use Nutrien's Confidential Information and asking him to confirm that he had returned and not kept any Nutrien property, including any documents and Confidential Information. *See id.* ¶ 56, Ex. G. Meherrin and Taylor responded to the respective letters, purporting to confirm they would not use Nutrien Confidential Information and that all such information had been returned or destroyed. *See id.* ¶ 57. Nutrien alleges that considerable damage has already been done, though, and that Taylor will not abide by any commitment he makes. *See id.*

## VI. Taylor Destroys Nutrien Property

Finally, Nutrien alleges that prior to his departure from the company, Taylor initiated a factory reset for two Nutrien devices in his possession—a Nutrien iPhone and Nutrien iPad—prior to returning them to the company. *See id.* ¶ 59. By wiping the devices, Taylor rendered any recovery of Nutrien information from them impossible. *See id.*

## VII. Procedural Posture

On June 11, 2025, Nutrien filed its Complaint in federal court, alleging claims of breach of contract, misappropriation of trade secrets in violation of federal and state law, tortious interference with contractual relations, current and prospective economic advantage, and lease agreements, unjust enrichment, unfair and deceptive trade practices, and common law conspiracy. *See generally id.*

The Defendants now move to dismiss Counts Two through Ten. *See* Dkt. 10 ("Motion to Dismiss" or the "Motion"). The parties have briefed the Motion. See Dkts. 11 (Brief in Support); 12 (Response in Opposition); 15 (Reply in Support). The matter is ready for the Court's consideration. For the reasons outlined below, the Court denies the Motion as to all claims arising from Counts Two, Three, Four, Six, Seven, Eight, Nine, and Ten, but grants the Motion as to any claims arising out of Count Five.

## ANALYSIS

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Factual allegations must be enough to raise a right to relief above a speculative level." *Twombly*, 550 U.S. at 555; *see* 5 Wright & Miller's Federal Practice and Procedure § 1216 (4th ed. 2020). Although a "plaintiff is not required to plead facts that constitute a prima facie case in order to survive a motion to dismiss," *see Coleman v. Maryland Ct. of App.*, 626

F.3d 187, 190 (4th Cir. 2010), the complaint's allegations should "allow the court to draw a reasonable inference that the defendant is liable for the misconduct alleged," *Iqbal*, 556 U.S. at 678.

On a motion to dismiss, the court must accept as true all well pleaded allegations and draw all reasonable factual inferences in plaintiff's favor. *See Twombly*, 550 U.S. at 555-56; *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But courts are not required to "accept as true 'legal conclusions drawn from the facts' or any other 'unwarranted inferences, unreasonable conclusions, or arguments." *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008) (quoting *Easter Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000).

## I. Nutrien Has Sufficiently Pled Misappropriation of Trade Secrets (Counts Two and Three) Against Taylor and Meherrin.

Nutrien alleges that the Defendants misappropriated its trade secrets, in violation of 18 U.S.C. § 1836(b) (Defend Trade Secrets Act of 2016, "DTSA") (Count Two) and N.C. Gen. Stat. § 66-152, *et seq.* (North Carolina Trade Secrets Protection Act, "NCTSPA") (Count Three). *See* Compl. ¶¶ 70-89. Nutrien has sufficiently pled the existence of trade secrets, as Defendants can ably "delineate that which [they are] accused of misappropriating," and the Court can assess whether Nutrien has also alleged the secrecy and independent economic value of the trade secrets. *Sysco Mach. Corp. v. DCS USA Corp.*, 143 F.4th 222, 228 (4th Cir. 2025). Furthermore, Nutrien has sufficiently alleged that the information was confidential and it took reasonable measures to maintain its secrecy.

Compl. ¶¶ 12, 72, 83. Nutrien's theft of trade secrets claims, under both state and federal law, therefore survive.

"When it is a claim for trade secret misappropriation under the DTSA . . . it demands plausible allegations that the plaintiff possessed a valid trade secret and that the trade secret was misappropriated." *See Sysco*, 143 F.4th at 228. Pursuant to the DTSA, information is a trade secret if (1) its owner has taken reasonable measures to keep it secret and (2) it derives independent economic value from its secrecy. *Samuel Sherbrooke Corporate, Ltd v. Mayer*, 159 F.4th 252, 256 (4th Cir. 2025); *see* 18 U.S.C. § 1839(3). Likewise, the NCTSPA "define[s] a trade secret in substantially the same terms." *See Sysco*, 143 F.4th at 228. The reasonable secrecy requirement is linked to the independent economic value requirement because the information's value lies in the competitive advantage over others that the plaintiff enjoys by virtue of its exclusive access to it. *Id.* (quoting *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1012 (1984)).

At this stage, Nutrien has sufficiently identified what trade secrets they claim Defendants have misappropriated. Both the federal and North Carolina statutes require the plaintiff to identify the trade secret it claims has been misappropriated with "sufficient particularity." *Sysco*, 143 F.4th at 228. "At the pleading stage, identifying the trade secret with sufficient particularity means describing the trade secret at a level of detail that enables a defendant to delineate that which he is accused of misappropriating . . . and that enables a court to determine whether the plaintiff has plausibly satisfied the

reasonable secrecy and independent economic value requirements." *Id.* (internal citations and quotation marks omitted).

Nutrien specifically alleges that its Confidential Information includes trade secrets. *See* Compl. ¶ 13. Nutrien further claims that Taylor had access to that Confidential Information concerning "Nutrien's proprietary seed products, recommended nutrition and protection, grower management tools, customer lists, pricing strategies, supplier data, business plans, marketing plans, and other sensitive business information." *See id*. ¶ 42. Nutrien asserts that Taylor downloaded documents containing trade secrets, including "customer lists, pricing guidelines, sales reports, and quote and order tracking logs." *See id*. ¶ 44.

Although arguably a close call, when weighing all inferences in favor of Nutrien, it has sufficiently pled that the Confidential Information is a trade secret. Defendants are correct that allegations defining trade secrets in broad or vague terms are insufficient to survive a motion to dismiss under both the DTSA and NCTSPA, Dkt. 11 at 6-8. *See, e.g.*, *Willett v. Window Gang, LLC*, No. 3:25-cv-44, 2026 WL 575903, at *7 (W.D. Va. Mar. 2, 2026) ("specialized marketing strategies and materials" and "Brand Standards Manual" without further factual allegations); *Power Home Solar, LLC v. Sigora Solar, LLC*, No. 3:20-cv-42, 2021 WL 3856459, at *10 (W.D. Va. Aug. 30, 2021) ("proprietary training, PHS's proprietary practices, methods, techniques, and pricing models, confidential customer databases, including the entire PHS's SalesForce database, and PHS proprietary quote

software, confidential sales memos, sales training manuals, and information concerning PHS's relationship with its suppliers and vendors" without "specific information about the unique nature of its customer identification and targeted marketing practices, including how this information is developed, ascertained, and protected"); *VRX USA, LLC v. VRX Ventures, Ltd.*, No. 3:20-cv-409, 2020 WL 7229672, at *7 (W.D.N.C. Dec. 8, 2020) ("the 'structure and design of the Ventures VRX Simulators' that are the 'subject of pending patent applications'").

In contrast, allegations that define trade secrets with greater specificity are sufficient to survive a motion to dismiss, particularly when customer pricing strategies and formulas—as Nutrien alleges, Compl. ¶¶ 42, 44—are involved. *See, e.g.*, *GE Betz Inc, v. Conrad*, 752 S.E.2d 634, 649 (N.C. App. Ct. 2013) ("pricing information, customer proposals, historical costs, and sales data"); *Bldg. Ctr., Inc. v. Carter Lumber Inc.,* No. 16-cvs-4186, 2016 WL 6142993, at *10 (N.C. Super. Ct. Oct. 21, 2016) ("names and contacts of customers; customer preferences, including the needs, requirements, and values of [Plaintiff's] customers; sales and marketing strategies; pricing structures; margins and profits; manufacturing technologies; and other confidential business information"); *LeBleu Corp. v. B. Kelley Enters.*, 2014 NCBC LEXIS 66, at *12 (N.C. Super. Ct. Dec. 9, 2014) ("customer lists, pricing information, transaction histories, key contacts, and customer leads"); *S. Fastening Sys. v. Grabber Constr. Prods.*, No. 14-cvs-4260, 2015 WL 2031007, at *4 (N.C. Super. Ct. Apr. 28, 2015) ("confidential customer information such as customer

contact information and customer buying preferences and history . . . confidential freight information, sales reports, prices and terms books, sales memos, sales training manuals, commission reports, and information concerning [plaintiff's] relationship with its vendors"); *see also Byrd's Lawn & Landscaping, Inc. v. Smith*, 542 S.E.2d 689, 692 (N.C. App. Ct. 2001) ("Confidential data regarding operating and pricing policies can also qualify as trade secrets."); *Rentals, Inc. v. Head & Engquist Equip., LLC*, No. 00-cvs-10358, 2002 WL 31002955, at *15 (N.C. Super. Ct. July 10, 2002) ("Business plans, marketing strategies, and customer information represent the type of information that, when accumulated over time, can be extremely valuable to competitors [and can qualify as trade secrets].").

Nutrien's allegations are more like those in *GE Betz Inc.*, *Carter Lumber*, and *Le Bleu Corp.* where the courts found the trade secret allegations sufficiently particular, especially when read in the context of Nutrien's other allegations. For example, Nutrien specifically identifies a document that Taylor misappropriated, that is, the spreadsheet entitled "2025 Default Price List and Info.xlsx." *See id.* ¶ 51.[1] Nutrien asserts that this document

[1] In arguing lack of particularity in their motion, the Defendants do not address this specific document but acknowledge it in their reply by simply asking a rhetorical question about *what* pricing information the spreadsheet contains: they argue that Nutrien's failure to define that is fatal to its claims. Dkt. 11 at 5-8. This argument might succeed had Nutrien not defined the document *by name* in its pleadings, leaving nothing to the Defendants' imagination as to what type of pricing information the document contained. And, if the Defendants remained confused, the Complaint goes on to identify exactly how Nutrien believes the Defendants *used* the specific document to undercut pricing with a customer in a specific geographic footprint.

contained pricing information for all Nutrien's customers at the Millingport branch for 2025,[2] *see id.*, and that Taylor used the information contained therein to undercut Nutrien's pricing with a customer. *See id*. Additionally, Nutrien alleges that this was one of multiple misappropriated documents that would allow Taylor and Meherrin to duplicate its business processes, products, and services unfairly and with little effort. *See id*. ¶ 46. Thus, like the cases that find that plaintiffs have sufficiently pled a misappropriation of trade secrets due to the theft of pricing and customer lists, so does Nutrien.

In addition to pleading the existence of a trade secret with sufficient particularity, Nutrien has adequately alleged it intended to keep the information secret and derived independent economic value from its secrecy. *Samuel Sherbrooke*, 159 F.4th at 256. To be

---

[2] In particular, "confidential data regarding operating and pricing policies"—like what Nutrien alleges here—can qualify as trade secrets. *Sw. Stainless v. Sappington*, 582 F.3d 1176, 1189 (10th Cir. 2009) (citation modified); *see also Continental Indus. Grp., Inc. v. Altunkilic*, 788 F. App'x 37, 40-41 (2d Cir. 2019) (unpublished) (finding that information such as, *inter alia*, customer and supplier lists and pricing and payment terms are "routinely afforded trade secret protection"); *Jasco Tools, Inc. v. Dana Corp.*, 574 F.3d 129, 152 (2d Cir. 2009) ("Confidential proprietary data relating to pricing, costs, systems, and methods are protected by trade secret law."). To that end, "[c]ourts have repeatedly held that knowledge of a customers' pricing information in the context of bidding is extremely potent in the hands of a competitor and such knowledge has been held to constitute a trade secret protectable by an injunction." *Juniper Ent., Inc. v. Calderhead*, No. 07-cv-2413, 2007 WL 9723385, at *23 (E.D.N.Y. Aug. 17, 2007) (citing cases). *See also Krawiec v. Manly*, 811 S.E.2d 542, 548 (N.C. 2018) ("Provided that the information meets the two requirements for a trade secret as defined in subsection 66-152(3), we agree with the determination of the Court of Appeals that information regarding customer lists, pricing formulas and bidding formulas can qualify as a trade secret under G.S. § 66-152(3).") (quotation and citation omitted).

a trade secret, "the plaintiff must provide evidence that the pricing structure conferred some type of competitive advantage or economic value to the information's owner." *Double Eagle Alloys, Inc. v. Hooper*, 134 F.4th 1078, 1093 (10th Cir. 2025) (citation omitted).

Here, Nutrien has alleged just that: that this document enabled Taylor and Meherrin to undercut Nutrien's pricing with one of its customers, and that the documents Taylor misappropriated generally enabled the Defendants to duplicate its business processes, products, and services unfairly and with little effort. *See* Compl. ¶ 46*; cf. IVS Hydro, Inc. v. Robinson*, 93 F. App'x 521, 528 (4th Cir. 2004) (per curiam) (concluding that the plaintiff's pricing information was not a trade secret because the "approach to pricing was not unique and [the plaintiff] did not expend a great deal of money developing its pricing techniques").

Nutrien has also alleged that its sufficiently pled trade secret was misappropriated. *See Sysco*, 143 F.4th at 228. In the DTSA and NCTSPA, the definition of misappropriation is "substantially identical." *See id.* at 229. Both statutes instruct that "[m]isappropriation involves 'acquisition,' 'disclosure,' or 'use' of a trade secret by 'improper means' or without consent." *Id.* In other words, "'the core' of a misappropriation claim is a 'breach of a duty of trust or confidentiality,'" and "'apart from breach of contract, abuse of confidence, or impropriety in the means of procurement, trade secrets may be copied as freely as devices or processes which are not secret.'" *Id.* at 230; *UsConnect, LLC v. Vendors*

*Exch. Int'l*, No. 1:23-cv-692, 2026 WL 1441150, at *8 (M.D.N.C. May 22, 2026) (quoting Restatement (First) of Torts § 757 cmt. a (Am. Law Inst. 1939)).

In this case, the Defendants do not argue about their lack of awareness of the trade secret, nor lack of opportunity to acquire it without Nutrien's consent. *See generally RF Micro Devices, Inc., v. Xiang*, No. 1:12-cv-967, 2016 WL 3892416, at *3 (M.D.N.C July 14, 2016). Nor could they. For example, Nutrien alleges that its trade secrets are password-protected and only available to employees who require the information to perform their jobs, and it never sells or gives its confidential information to third parties. *See* Compl. ¶ 12. And, Nutrien alleges Taylor, without its consent, downloaded highly sensitive information about Nutrien's business to help its competitor, Meherrin, steal its customers. *Id.* ¶¶ 44-45. Before leaving, Taylor suspiciously wiped his Nutrien iPhone and iPad. *Id.* ¶ 59. These are sufficient allegations that Taylor and Meherrin used improper means to breach a duty of trust and confidentiality owed to Nutrien, leading credence to a misappropriation of trade secrets claim.

Thus, Nutrien has sufficiently alleged a category of information broadly recognized to constitute trade secrets, and one document in particular whose misappropriation caused economic harm. This is not a motion for summary judgment, where the parties have had the opportunity to develop the record such that the Court can determine whether a reasonable jury could find that the information at issue meets the legal definition of a trade secret. This is a motion to dismiss, where requirements are

essentially twofold: (1) fair notice to the defendants; and (2) allegations of a plausible claim. *See Langford v. Joyner*, 62 F.4th 122, 125 (4th Cir. 2023); *Rice v. Adams*, 172 F.4th 428, 432 (4th. Cir. 2026). Nutrien has cleared the bar of both, under the case law regarding trade secrets pleading set forth in length above.

Therefore, the Court denies the Defendants' motions to dismiss Counts Two and Three.

## II. Nutrien Has Sufficiently Pled Tortious Interference with Contracts as to Taylor's Employment Agreements (Count Four) and Prospective Economic Advantage as to the Lease Agreement (Count Six) But Failed to Sufficiently Plead Tortious Interference with Prospective Economic Advantage as to the Customer Contracts (Count Five).

North Carolina law recognizes multiple varieties of tortious interference claims, for both contracts and business relations (current and prospective). Nutrien has alleged both, specifically alleging as to contracts: Meherrin's interference with Taylor's employment contracts with Nutrien (Count Four) and Meherrin and Taylor's interference with its leasing agreement for the Millingport Road Property (Count Six). For Count Five, Nutrien alleges that Meherrin interfered with its current and prospective economic advantage vis a vis contracts that Nutrien customers discontinued.

Though these two claims are distinct, the "case law refers to tortious interference with business relations and tortious interference with contracts somewhat interchangeably and imprecisely." *Superior Performers, Inc. v. Phelps*, 154 F. Supp. 3d 237, 248 (M.D.N.C. 2016) (citing *Sunbelt Rentals, Inc. v. Head & Engquist Equip., L.L.C.*, No. 00-

cvs-10358, 2002 WL 31002955, at *10 (N.C. Sup. Ct. July 10, 2002) (acknowledging confusion due to the "courts' varying degree of precision in framing tortious interference issues" and noting that "[t]he nomenclature of broad categories and specific causes of action have sometimes been used interchangeably")).

### A. Count Four: Tortious Interference with Contractual Relations – Employee Agreements.

Nutrien has sufficiently pled Count Four regarding Meherrin's alleged tortious interference with Taylor's Employment Agreements with Nutrien. A plaintiff alleging a claim of tortious interference with contract must plead:

> (1) a valid contract between the plaintiff and a third party which confers upon the plaintiff a contractual right against a third party; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to [the] plaintiff.

*See United Labs, Inc. v. Kuykendall*, 370 S.E.2d 375, 387 (N.C. 1988).

Here, elements one, two, and five are sufficiently pled and uncontested. As pled, there were two valid contracts between Nutrien, the plaintiff, and a third party, Taylor: the conflicts-of-interest agreement and the confidentiality agreement (referenced as the "Employment Agreements"). *See* Compl. ¶¶ 15-18. And Meherrin does not contest the validity of either. Nor does Meherrin challenge that Nutrien adequately pled Meherrin's knowledge of the contracts or Nutrien's damages. *See id.* ¶¶ 92, 95, 102.

Nutrien also sufficiently pled the third element despite Meherrin's objections. Meherrin argues that Nutrien has not adequately pled that it intentionally induced Taylor

to violate the contracts. *See* Dkt. 11 at 9-10. However, paragraph 93 of the Complaint states: "[u]pon information and belief, Meherrin intentionally induced Taylor to breach the Employment Agreements and otherwise fail to perform his obligations under the Employment Agreements . . . ." Compl. ¶ 93. Nutrien notes allegations that buttress this assertion, specifically, Taylor's download of confidential information prior to his departure to work for Meherrin, *see id.* ¶¶ 43-46, Taylor's contact of a Nutrien customer, *see id*. ¶ 51, and Taylor's initiation of a factory reset of two Nutrien devices in his possession, *see id*. ¶ 59.

"Generally, conclusory allegations based solely 'upon information and belief' are 'insufficient to defeat a motion to dismiss.'" *Mystic Retreat Med Spa & Weight Loss Ctr. v. Ascentium Capital LLC*, 615 F. Supp. 3d 379, 384 (M.D.N.C. 2022) (quoting *Harman v. Unisys Corp.*, 356 F. App'x 638, 640-41 (4th Cir. 2009) (unpublished)). However, the use of those "magic words" may be sufficient and "make otherwise unsupported claims plausible when the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible." *Id*. (quoting *Citizens United v. Schneiderman*, 882 F.3d 374, 384–85 (2d Cir. 2018)).

Here, the fact at issue—whether Meherrin induced Taylor's violation of the contracts—*is* peculiarly within Meherrin's possession. And the additional facts Nutrien alleges (Taylor downloading confidential information and contacting a Nutrien

customer) render its assertions plausible for purposes of this stage of the litigation. Therefore, Meherrin's argument fails and Nutrien sufficiently pled the third element of tortious interference.

This leaves the fourth element: acting without justification. As to that, "[a] person 'acts without justification in inducing the breach of contract . . . if he has no sufficient lawful reason for his conduct.'" *Champion Pro Consulting Grp., Inc. v. Impact Sports Football, LLC*, 976 F. Supp. 2d 706, 716 (M.D.N.C. 2013) (quoting and citing *Childress v. Abeles*, 84 S.E.2d 176, 182 (N.C. 1954)). "Under North Carolina law, whether a defendant's conduct is justified depends upon the circumstances surrounding the interference, the defendant's motive or conduct, the interests sought to be advanced, the social interest in protecting the freedom of action of the defendant, and the contractual interests of the other party." *Ga. Pac. Consumer Prods., LP v. Von Drehle Corp.*, 618 F.3d 441, 456 (4th Cir. 2010) (citing *Embree Constr. Grp., Inc. v. Rafcor, Inc.*, 411 S.E.2d 916, 924 (N.C. 1992)). "If the defendant's only motive is a malicious wish to injure the plaintiff, [defendant's] actions are not justified." *Peoples Sec. Life Ins. Co. v. Hooks,* 367 S.E.2d 647, 650 (N.C. 1988).

"The malice required to overcome a justification of business competition is legal malice, and not actual malice." *Wells Fargo Ins. Servs. USA, Inc. v. Link*, 827 S.E.2d 458, 477 (N.C. 2019) (quoting *Hooks*, 367 S.E.2d at 650). And "[a] person acts with legal malice if he does a wrongful act or exceeds his legal right or authority in order to prevent the

continuation of the contract between the parties." *See Robinson, Bradshaw, & Hinson, P.A. v. Smith*, 498 S.E.2d 841, 851 (N.C. App. Ct. 1998).

Meherrin argues that Nutrien cannot meet this element because it merely offered Taylor employment, citing North Carolina law for the proposition that "competition in business constitutes justifiable interference in another's business relations and is not actionable so long as it is carried on in furtherance of one's own interests and by means that are lawful." *See Hooks*, 367 S.E.2d at 650. While this is the case, this fact is not all that Nutrien alleged. Specifically, as to Count Four, Nutrien alleges that Meherrin induced Taylor to (1) breach his Confidentiality Agreement and provide trade secret material to it, and (2) breach his Conflicts of Interest Agreement by negotiating a lease while at Nutrien that favored Meherrin. *Id.* ¶¶ 90-96. Both claims sufficiently allege legal malice, and thus both claims survive.

The theft and dissemination of trade secret material is not lawful and, therefore, not justified. *See, e.g.*, *Wells Fargo Ins. Servs. USA, Inc.*, 827 S.E.458 at 477-78 (finding that the allegation that defendant urged former plaintiff's employee co-defendant to leave plaintiff for defendant company "arguably would support the claim for tortious interference . . . and Plaintiff's claim that [the defendant] tortiously interfered with the confidentiality covenant in [the] Restrictive Agreement"); *MarketPlace 4 Ins., LLC v. Vaughn*, No. 22-cvs-7588, 2023 WL 2229694, at *13 (N.C. Super. Feb. 24, 2023) (noting that "the 'without justification' element of a tortious interference claim is satisfied where the

defendant's conduct involved the use of unlawful means," in finding that misappropriation of trade secrets supported tortious interference claim).

Here, Nutrien sufficiently alleges that there was no legitimate justification for Meherrin's inducement of Taylor to breach his confidentiality obligations under his Employment Agreement. Compl. ¶¶ 46-47, 67, 92-96. On November 12, 2018, Taylor signed an employment contract with Nutrien that included the Confidentiality Agreement titled Nutrien Employees Agreement Respecting Inventions and Confidential Information. *Id.* ¶ 17. That Confidentiality Agreement provides that Taylor agrees "not to use on [his] own behalf or on behalf of others, nor . . . divulge to others . . . any trade secrets or confidential information, processes, plans, inventions, knowledge or data of [Nutrien] . . . ." *Id.* ¶ 17; *see also* Dkt. 1-2. Nutrien alleges that Meherrin knew of this agreement yet induced Taylor to break it anyways. Compl. ¶¶ 92-96.

Nutrien buttresses its claim that Meherrin induced Taylor to break his Confidentiality Agreement with further allegations. For example, Taylor allegedly extracted Nutrien's spreadsheet titled "2025 Default Price List and Info.xlsx." and provided it to Meherrin. *Id.* ¶ 51. And, right before leaving Nutrien, Taylor wiped the drives of his work devices, leaving behind no evidence of what else he may have taken. *Id.* ¶¶ 58-59. The spreadsheet Taylor allegedly took included customer and pricing information that Meherrin used to undercut a potential customer, resulting in Nutrien having to lower their own prices for that customer to retain the customer's business. *Id.*

¶ 51. Thus, all these allegations support the notion that Meherrin tortiously interfered with Taylor's Confidentiality Agreement contract with Nutrien for Meherrin's own benefit, namely to either steal customers or force Nutrien to lower its prices to retain their business. *See S. Fastening Sys.*, 2015 WL 2031007, at *9 (finding the tortious interference claim viable where "[i]t is clear from the face of the Complaint that SFS alleges facts showing that GCP has improperly acquired, disclosed and used SFS's confidential and trade secret information to sell GCP products at prices below SFS's prices in order to block SFS from those customer accounts and to cause SFS financial damage").

Additionally, Nutrien sufficiently alleges that there was no legitimate justification for Meherrin's inducement of Taylor to breach the conflicts of interest provision of Taylor's contract. Taylor's Conflicts of Interest Agreement with Nutrien provides that Talor agreed to avoid conflicts of interests such as "[a]ny services performed either directly or indirectly, by directive, managerial, or consultative nature for any enterprise or company;" "[a]ny services performed either directly or indirectly for compensation for any enterprise or company that may require the use of [Nutrien] equipment or labor [that] is performed during normal working hours;" and "[d]irect or indirect competition with [Nutrien] . . . in the purchase, sale or *lease of rights in real or personal property*." *Id.* ¶ 15 (emphasis added); *see generally* Dkt. 1-1.

Yet, Nutrien alleges that Meherrin and Taylor acted in concert to evict Nutrien out of its lease that it had had for nearly twenty years, *see* Compl. ¶ 132, after spending a

significant amount of time and effort renovating and improving the property, *see id.* ¶¶ 25, 33, 106. In fact, Taylor was the one who, while at Nutrien, negotiated the new lease on behalf of Nutrien. *Id.* ¶ 32. Within a year after that negotiation, Taylor left Nutrien for its competitor, Meherrin, who was conveniently positioned to take over the lease for the Millingport Road Property. *See Id.* ¶¶ 36-41, 107; *see also* Dkt. 1-5 at 2. And, Nutrien first heard about their need to vacate the property only nineteen days before they would be evicted. Compl. ¶¶ 34-35. All of these allegations establish that Nutrien pled sufficient facts to show that Meherrin tortiously interfered—without justification—with Taylor's Conflicts of Interest Agreement contract with Nutrien. *See Sandhills Home Care, L.L.C. v. Companion Home Care-Unimed, Inc.*, No. 15-cvs-3329, 2016 WL 4164460, at *15 (N.C. Super. Ct. Aug. 1, 2016) (holding competitor acted without justification when plaintiff alleged that the competitor "consciously and knowingly encouraged the individual [former employees] to breach their contracts").

Accordingly, the Court denies the motion to dismiss Count Four.

### B. Count Five: Tortious Interference with Current and Prospective Economic Advantage – Customer Contracts.

As to Count Five, although Nutrien alleges it had to reduce its prices to retain a customer—after Meherrin and Taylor used its trade secrets against them—Nutrien ultimately was able to secure its contract with that customer. *See* Compl. ¶ 51. As a result, Nutrien's tortious interference claim regarding that customer fails.

When a defendant "prevents the making of contract" with a third party, a plaintiff can allege a claim for tortious interference with prospective economic advantage. *See Owens v. Pepsi Cola Bottling Co. of Hickory, NC, Inc.*, 412 S.E.2d 636, 644 (N.C. 1992). Under those circumstances, "a plaintiff must allege facts to show that the defendants acted without justification in inducing a third party to refrain from entering into a contract with them which contract would have ensued but for the interference and that the defendants' conduct proximately caused measurable damages[.]" *Superior Performers*, 154 F. Supp. 3d at 248-49 (alteration in original, quoting and citing *United Labs.*, 370 S.E.2d at 387; *Walker v. Sloan*, 529 S.E.2d 236, 242 (N.C. App. Ct. 2000); *Cameron v. New Hanover Mem'l Hosp.*, 293 S.E.2d 901, 917 (N.C. App. Ct. 1982)).

Mere expectation of a continuing business relationship with a third party is insufficient. *See Dalton v. Camp*, 548 S.E.2d 704, 709-10 (N.C. 2001); *see also Sports Quest, Inc. v. Dale Earnhardt, Inc.*, No. 02-cvs-140, 01-cvs-2200, 2004 WL 742918, at *5 (N.C. Super. Ct. 2004) (finding that a plaintiff's expectation of future contracts with current customers will not suffice). There must be actual loss. *See AECOM Tech. Corp. v. Keating*, No. 11-cvs-9225, 2012 WL 370296, at *5 (N.C. Special Super. Ct. Feb. 6, 2012) (unpublished). Thus, a plaintiff must plead a specific and particular contract a third party was induced not to enter. *See DaimlerChrysler Corp. v. Kirkhart,* 561 S.E.2d 276, 286 (N.C. App. Ct. 2002) (finding that the plaintiff failed to establish a likelihood of success on the merits of its tortious interference with prospective advantage claim when it "failed to identify any

particular contract that a third party has been induced to refrain from entering into" with the plaintiff).

Meherrin argues that Nutrien has not pled the existence of a specific contract and so its claim here fails, *see* Dkt. 11 at 15; Nutrien directs the Court's attention to one customer with whom it contracted that Meherrin also solicited, *see* Dkt. 12 at 17.[3] While Nutrien did specify a customer and related contract, *see* Compl. ¶ 51, that customer ultimately did contract with Nutrien, *see id*. Nutrien argues that it was harmed because Defendants' tortious interference and unlawful use of Nutrien's Confidential Information in Meherrin's own negotiations with the customer forced Nutrien to lower its prices to compete with Meherrin and retain that customer's business. Compl. ¶ 51; Dkt. 12 at 17-18. These allegations, however, can and do support other claims.

As to Count Five for tortious interference with prospective economic advantage, however, Nutrien cannot meet a required element of this inquiry: that the third party *refrained* from entering into the contract with the aggrieved party. *See Superior Performers*, 154 F. Supp. 3d at 249; *E-Ntech Indep. Testing Servs., Inc. v. Air Masters, Inc.*, No. 16-cvs-3092, 2017 WL 73449, at *6 (N.C. Super. Ct. Jan. 5, 2017) (tortious interference with

[3] Although Count Five of the Complaint alleges tortious interference on "current" as well as future contracts, the allegations of Count Five solely discuss future contracts as it relates to potential customers or Nutrien's past attempt to secure the one customer's business that Meherrin undercut. *See* Compl. ¶¶ 97-103.

economic prospects survived where plaintiff pled actual contract lost because of defendant's conduct).

Therefore, the Court grants the motion to dismiss Count Five.

### C. Count Six: Tortious Interference with Contractual Relations – Lease Agreement.

To sufficiently plead tortious interference with contract, a plaintiff must show that a valid contract existed between the plaintiff and a third party which conferred upon the plaintiff a contractual right against the third party. *United Labs., Inc.*, 370 S.E.2d at 387. Thus, "a claim for tortious interference with existing contracts requires the plaintiff to allege that 'a valid contract existed between plaintiff and a third person' who was induced by defendant not to perform without justification." *E-Ntech Indep. Testing Servs.*, 2017 WL 73449, at *5 (citing *United Labs., Inc*, 370 S.E.2d at 387; *Beck v. City of Durham*, 573 S.E.2d 183, 191 (N.C. App. Ct. 2002)).

Here, Nutrien's claim in Count Six rests on the fact that Nutrien no longer has a contractual relationship with the Millingport Road Property Landlord because its lease was not renewed. *See* Compl. ¶¶ 104-11. Thus, because Nutrien's claim is based off a future contract with the Landlord that Meherrin and Taylor allegedly interfered with, this Court will interpret Nutrien's tortious interference with contractual relations claim as a tortious interference with prospective economic advantage claim. *See E-Ntech Indep. Testing Servs.*, 2017 WL 73449, at *6 (interpreting Plaintiff's tortious interference with contract claim as a prospective economic advantage claim when Plaintiff alleged that

Defendants, while still employed at Plaintiff, used trade secrets to steal a potential contract with a client Plaintiff had had a business relationship with for ten years).

As explained above, to state a claim for tortious interference with prospective economic advantage, the plaintiff must allege that the defendant "acted without justification in inducing a third party to refrain from entering into a contract with [the plaintiff] which contract would have ensued but for the interference." *Sloan*, 529 S.E.2d at 242 (citation modified). For both types of tortious interference claims, a motion to dismiss should be granted if the defendant's interference with the current or future contract was legally justified or privileged. *Hooks*, 367 S.E.2d at 650.

A court, however, should deny a motion to dismiss a tortious interference with prospective economic advantage claim when the defendants unjustifiably interfere with a proposed future contract between parties that have a longstanding business relationship—like Nutrien's relationship with the Millingport Road Property Landlord. *See E-Ntech Indep. Testing Servs.*, 2017 WL 73449, at *6. In *E-Ntech Independent Testing Services*, the plaintiff, a corporation that provided HVAC testing services for hospitals, sued two of its former employees for tortious interference with prospective economic advantage. *Id.* The plaintiff alleged that the former employees, while employed for the plaintiff, used the plaintiff's proprietary trade secrets to contract on their own with a hospital with whom the plaintiff had developed a ten-year business relationship. *Id.* at *2, 6. The court held that the plaintiff sufficiently alleged that it would have contracted

with the hospital but for the defendants' proposal because the plaintiff had provided HVAC services for the hospital for the last ten years. *Id.* at *6. Furthermore, the defendants were not legally justified in taking the hospital's business because the defendants used the plaintiff's proprietary trade secrets to do so. *Id.* Therefore, the court denied the defendant's motion to dismiss the tortious interference with prospective economic advantage claim. *Id.*

Here, Nutrien sufficiently alleges that it would have renewed its lease contract with the Millington Road Property Landlord but for Taylor and Meherrin's alleged scheme to take over the lease. Compl. ¶¶ 20-41. Like in *E-Ntech* where the ten-year business relationship was enough to establish that the contract would have ensued but for the defendants' interference, Nutrien and the Millingport Road Property Landlord had a twenty-year history of leasing the property with auto-renewals every three years. Compl. ¶¶ 26-27. This extensive history is sufficient—at least at the pleading stage—to show that Nutrien would have received a new lease but for the Defendants' actions.

The issue of whether the Defendants were legally justified in their actions is more complicated. The only significant difference between *E-Ntech* and this case is that in *E-Ntech* the defendants lacked legal justification in part because they stole trade secrets, whereas here, Nutrien alleges that Taylor and Meherrin's scheme to evict Nutrien from the Millingport Road Property constituted sufficient legal malice to prove the Defendants

were unjustified in their actions. At this stage in the proceedings, prior to discovery, the Court agrees with Nutrien.

A business's nefarious scheme to destroy a competitor or cause them financial damage is not reasonable competitive behavior and is legally unjustifiable for tortious interference cases. *See Sandhills Home Care, L.L.C.*, 2016 WL 4164460, at *15 (denying motion to dismiss tortious interference claim when defendants consciously encouraged Plaintiff's former employees to breach their employment contracts with Plaintiff because "Plaintiff's allegation of a specific plan or scheme to destroy Plaintiff's business goes beyond reasonable competitive behavior"); *S. Fastening Sys.*, 2015 WL 2031007, at *9 (allowing tortious interference claim to move forward because, *inter alia*, the defendant acted for a "wrong purpose . . . [and] without legal justification" when it stole confidential information to cause the plaintiff damage). Additionally, a scheme to recruit numerous employees with confidential business information from a competitor can also be unjustifiable interference. *Sunbelt Rentals, Inc. v. Head & Engquist Equip., L.L.C.*, No. 00-cvs-10358, 2003 WL 21017456, at *52 (N.C. Super. Ct. May 2, 2003) ("Here it is the surreptitious recruitment of *en masse* defections timed to disrupt [plaintiff's] business and take advantage of the employees' knowledge of confidential business information which crosses over the line of fair competition.").

Therefore "the general rule prevails that unlawful interference with the freedom of contract is actionable [when it maliciously] prevent[s] the making of a contract . . . with

[the] design to injure the plaintiff or [gain] some advantage at his expense." *Coleman v. Whisnant*, 35 S.E.2d 647, 656 (N.C. 1945). This rule applies to interference with a business's attempt to obtain a land lease. *See Regency Ctrs. Acquisition, LLC v. Crescent Acquisitions, LLC*, No. 17-cvs-11354, 2018 WL 562749, at *8 (N.C. Super. Ct. Jan. 24, 2018) (granting motion to dismiss tortious interference with prospective economic advantage claim because "Plaintiff has not alleged that Defendant engaged in any purposeful action towards Whole Foods that influenced Whole Foods not to enter into a lease with Plaintiff.").

Here, at this stage, and viewing all allegations in favor of Nutrien, Nutrien sufficiently alleged that Taylor and Meherrin conducted a scheme to unjustifiably terminate a longstanding lease relationship between Nutrien and the Millingport Road Property Landlord (Morgan). Compl. ¶ 51. Nutrien alleges that Taylor, Morgan, and Meherrin colluded together to evict Nutrien from the Millingport Road Property so that Meherrin could take over the lease and take advantage of the leftover equipment and improvements. *Id*. ¶¶ 41, 132. To support these allegations, Nutrien alleges that Taylor, when working for Nutrien, worked with Morgan to change Nutrien's lease from a three-year, automatic-renewed lease to a one-year term lease. *Id*. ¶¶ 28-32.

However, at the time, Nutrien thought that the status quo remained the same and that the lease would continue to be renewed on a yearly basis, as it had been for nearly two decades. *Id*. ¶¶ 20, 30. In fact, in November 2024, just a month before it knew it

would not be renewing the lease, Nutrien invested around $25,000 in further improvements to the property. *Id*. ¶ 33. On December 12, 2024, Nutrien received notice for the first time that it had to leave the property by December 31, 2024, because Meherrin would be taking over the lease. *Id*. ¶¶ 34-36.

Nutrien sufficiently alleges Meherrin knew these details and was aware of the timing. Without prompting from Nutrien, an employee from Meherrin called Nutrien and informed Nutrien that Meherrin would provide no flexibility with the eviction date. *Id*. ¶¶ 38-39. Meherrin's employee also asked why Nutrien was removing its equipment, given the cost to do so. *Id.* ¶ 38. Nutrien alleges that this suggests that, in giving Nutrien so little time to move out, Meherrin believed it would be able to take over Nutrien's improvements, equipment, and inventory for the benefit of Meherrin's agricultural retail business. *Id.* Because that was unacceptable to Nutrien, Nutrien expended significant costs and effort to remove its property, equipment, and improvements before the lease expired. *Id*. ¶ 40. Given the quick turnaround, Nutrien alleges that it could not remove some of the improvements to the property and had to leave them behind. *Id*. ¶ 117.[4] In addition, on December 27, 2024, four days before the lease expired, all the remaining employees at the Millingport branch resigned from Nutrien and joined Meherrin. *Id*. ¶¶ 52-53.

---

[4] The Court notes that while at this stage Nutrien sufficiently pled that some property was left behind, the lackluster specificity on this claim was disappointingly sparse.

In other words, Nutrien sufficiently alleges that these facts show a systematic scheme between Taylor and Meherrin to, from the beginning, renegotiate Nutrien's lease to spring an eviction on Nutrien last minute so Meherrin could take advantage of the thousands of dollars of improvements to the land that would be left behind. Using a competitor's own employee to infiltrate a longstanding contractual relationship with a landlord is not reasonable competitive behavior that satisfies the legal justification requirement. And the fact that the removal of Nutrien from the property resulted in all its employees leaving the branch and joining Meherrin further supports that Taylor and Meherrin's scheme was without legal justification. Viewing Nutrien's allegations in its favor, Taylor and Meherrin's plan was designed to injure Nutrien or allow Meherrin to gain some advantage at Nutrien's expense. Thus, Nutrien sufficiently pled that it would have renewed its longstanding lease but for Taylor and Meherrin's unjustified scheme to interfere with that contractual relationship. The tortious interference with prospective economic advantage claim can move forward.

The Court denies the motion to dismiss Count Six.

## III. Nutrien Has Sufficiently Pled Its Unjust Enrichment Claim (Count Seven) Against Meherrin.

Nutrien sufficiently alleges its unjust enrichment claim against just Meherrin, arguing its competitor wrongfully reaped the benefits of Nutrien's Confidential Information (via Taylor) and the improvements that Nutrien made to the Millingport Road Property prior to its eviction. *See* Compl. ¶¶ 113-18.

Unjust enrichment is "a claim in quasi contract or a contract implied in law." *See Booe v. Shadrick*, 369 S.E.2d 554, 556 (N.C. 1988). "To state a claim for unjust enrichment, a plaintiff must allege that he conferred a benefit on the other party." *Champion Pro Consulting Grp.*, 976 F. Supp. 2d at 720 (M.D.N.C. 2013) (citing *Booe*, 369 S.E.2d at 556). "The benefit must not have been conferred officiously, that is it must not be conferred by an interference in the affairs of the other party in a manner that is not justified in the circumstances. The benefit must not be gratuitous and it must be measurable." *Id.* (quoting *Booe*, 369 S.E.2d at 556). Further, "the defendant must have consciously accepted the benefit." *See JPMorgan Chase Bank, Nat'l Ass'n. v Browning*, 750 S.E.2d 555, 559 (N.C. App. Ct. 2013) (internal citations omitted).

Regarding the "gratuitous" element,

> [t]he burden rests upon the plaintiff to 'show circumstances from which it might be inferred that the services were rendered and received with the mutual understanding that they were to be paid for. . . . [S]uch an inference is permissible when a person knowingly accepts from another services of value, or . . . under circumstances calculated to put a reasonable person on notice that the services are not gratuitous.

*See Metric Constructors, Inc. v. Bank of Tokyo-Mitsubishi, Ltd.*, 72 F. App'x 916, 922 (4th Cir. 2003) (unpublished) (quoting *Lindley v. Frazier*, 55 S.E.2d 815, 816 (N.C. 1949)).

Here, Nutrien alleges enough facts that Meherrin was unjustly enriched by receiving Nutrien's Confidential Information from Taylor. Nutrien claims that "[t]he Confidential Information . . . has a considerable fair market value in that it consists of information such as customer lists, pricing strategies, customer product preferences, and

other information that has immense value to any person and entities operating in a business similar to Nutrien." Compl. ¶ 114. In other words, because Meherrin possesses this information, it need not "spend the time, money, and effort performed by Nutrien to develop the information, strategies, and relationships" provided therein. *Id.* ¶ 116. Therefore, Nutrien conferred a benefit on Meherrin because Taylor gave that information over to Meherrin. And, the Confidential Information was not conferred officiously or gratuitously because Nutrien alleges that Taylor and Meherrin schemed to steal Nutrien's information for Meherrin's benefit. *Id.* ¶ 45. Therefore, Nutrien sufficiently pled unjust enrichment regarding the allegedly misappropriated Confidential Information.

Meherrin argues that Nutrien has failed to plead that Taylor did not gratuitously bestow the Confidential Information upon Meherrin. *See* Dkt. 11 at 19-20. But "[u]nder North Carolina law, it is sufficient for a plaintiff to prove that it has conferred some benefit on the defendant, without regard to the directness of the transaction." *See Metric Constructors, Inc.*, 72 F. App'x at 921. Thus, Nutrien did not need to plead that *Taylor's* actions were non-gratuitous, especially in light of the benefits that Meherrin reaped. Rather, it was sufficient to show that Nutrien itself did not gratuitously provide Meherrin with the Confidential Information. And, indeed, North Carolina courts have permitted unjust enrichment claims regarding this manner of misappropriation of trade secrets to go forward. *See Power Home Solar, LLC v. Sigora Solar, LLC*, No. 20-cvs-7165, 2021 WL 2530984, at *16 (N.C. Super. June 18, 2021) (holding unjust enrichment claim survives a

motion to dismiss because of the following allegations: "Power Home alleges . . . that the Former Employees were given [it]s Confidential Information to perform their job duties at Power Home, that they were legally obligated to maintain [its] secrecy . . . , that Sigora knew or should have known that the Former Employees were prohibited from using the Confidential Information in its competing business, and that the Former Employees and Sigora are using Power Home's Confidential Information and trade secrets in conducting a competing business."); *see also PDF Elec. & Supply Co. v. Jacobsen*, No. 20-cvs-4609, 2020 WL 6750068, at *4-6 (N.C. Super. Ct. Sept. 9, 2020); *S. Fastening Sys.*, 2015 WL 2031007, at *11.

Nutrien also has sufficiently pled that Meherrin was unjustly enriched by wrongfully interfering with Nutrien's lease of the Millingport Road Property and obtaining the benefits of the improvements Nutrien had previously made on the land. *See* Compl. ¶ 117. To start, Meherrin waived any objections to this argument by failing to provide any argument for dismissing this part of the Complaint.[5] *See* Dkts. 11, 15; *Global Impact Ministries, Inc. v. City of Greensboro*, No. 1:20-cv-329, 2022 WL 801714, at *10 (M.D.N.C. Mar. 16, 2022) ("When the defendant fails to provide argument in its brief regarding why a court should dismiss the plaintiff's claim, the defendant is deemed to

---

[5] While it is true that the Defendants, in their reply in support of Defendants' motion to dismiss, briefly acknowledged that Nutrien supplied allegations surrounding the building lease, this acknowledgement was purely to distinguish an unfavorable case and thus is not sufficient to be interpreted as an argument against Nutrien's allegations. *See* Dkt. 15 at 11.

have waived that argument."); *see also Stocker v. Colinger Ford, Inc.*, 342 F. Supp. 2d 410, 413 (M.D.N.C. 2004) (finding defendant waived an argument in its motion to dismiss because it "filed no brief" on that particular argument).

Regardless, Nutrien still sufficiently pled unjust enrichment as it relates to the Millingport Road Property. Nutrien alleges that during its twenty-year period of leasing the Millingport Road Property, it made "extensive improvements to the property, including adding and expanding buildings and installing specialized storage equipment." Compl. ¶ 25. Additionally, in November 2024, one month before it learned of its need to vacate the property, Nutrien invested around $25,000 in further improvements. *Id.* ¶ 33. Because Meherrin took over the lease in January 2025, and because Nutrien was unable to remove all the improvements to the property by the end of its lease agreement, Nutrien conferred a benefit onto Meherrin. *Id.* ¶ 117.

Furthermore, Nutrien sufficiently alleges that the improvements were not conferred officiously or gratuitously and that Meherrin consciously accepted the improvements that were left. Nutrien alleged that it would not have made these investments had it known that its lease would be terminated and given over to Meherrin. *Id.* ¶ 33. During a phone call between Eddie Price, one of Meherrin's employees, and Ben Hawkinson, one of Nutrien's employees, Price "suggest[ed] to Hawkinson that Meherrin expected, in giving Nutrien so little time to move, that Meherrin would be able to take over Nutrien's improvements, equipment, and inventory for the benefit of Meherrin's

agricultural retail ("ag retail") business." *Id.* ¶¶ 37-38. But, instead of gifting the equipment and improvements to Meherrin, Nutrien expended significant costs and effort trying to remove all the property, equipment, and improvements before the lease expired on December 31, 2024. *Id.* ¶ 40, 117 (noting Nutrien was unable to remove all of the additions and improvements made to the property). Thus, based on the phone call and Nutrien's attempt to remove the property, Meherrin knew that Nutrien did not intend to gratuitously leave the equipment, but Meherrin still accepted the remaining improvements anyway. *Id.* ¶ 117. Therefore, at this stage in the proceedings, Nutrien has sufficiently pled that Meherrin was unjustly enriched by the leftover improvements on the Millingport Road Property.

Therefore, this Court denies the Defendants' motion to dismiss Count Seven.

## IV. Nutrien Has Sufficiently Pled Its Claims Regarding Unfair and Deceptive Trade Practices (Counts Eight and Nine) Against Taylor and Meherrin.

Nutrien properly alleged that Taylor engaged in unfair and deceptive trade practices in violation of North Carolina law when he violated the terms of his Employment Agreements by misappropriating confidential information and interfering with its business relations (Count Eight). And Nutrien properly alleged that same violation against Meherrin based on its acceptance and use of Nutrien's confidential information and interference with its business relations (Count Nine). Thus, the Court denies Defendants' Motion to Dismiss regarding these Counts.

A plaintiff states a valid claim under the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA or "UTPA") when they show (1) the defendant "engaged in an unfair or deceptive act or practice" (2) in or affecting commerce that (3) proximately cause injury to the plaintiff. *Gilbert v. Residential Funding LLC*, 678 F.3d 271, 280 (4th Cir. 2012).

The second and third elements of UDTPA are easily satisfied. Regarding the second element, there is no question that the Defendants' actions to (1) take the confidential information and use it to undercut customers and (2) scheme to change Nutrien's lease to give up its investments on property are "in or affecting commerce." The statute "broadly defines 'commerce' as 'all business activities,'" which includes "an organization's 'regular, day-to-day activities, or affairs.'" *Turpin v. Charlotte Latin Schs., Inc.*, 933 S.E.2d 671, 685 (N.C. 2026). As alleged, the Defendants' actions have interfered with Nutrien's relationship with the Millingport Road Property Landlord, its customers, and its employees. *See* Dkt. 105. Regarding the third element, Nutrien adequately pleads that Defendants' alleged unfair and deceptive trade practices proximately injured Nutrien. For instance, Nutrien alleges these actions injured Nutrien's business and goodwill, *see* Compl. at ¶¶ 123, 128, including the loss of customers and employees. *Id.* ¶¶ 52-54, 98-102.

Regarding the first element of UDTPA, a practice is unfair when it "'offends established public policy'" or is "immoral, unethical, oppressive, unscrupulous, or

substantially injurious to consumers." *Turpin*, 933 S.E.2d at 685 (quoting *Bumpers v. Cnty. Bank of N. Va.*, 747 S.E.2d 220, 228 (N.C. 2013)). An act is deceptive if it "has the capacity or tendency to deceive." *Id.*

Nutrien properly alleges unfair practices against both Defendants regarding the alleged theft of the Confidential Information. "Claims for misappropriation of trade secrets and tortious interference with contract may form the basis of a UDTP claim." *S. Fastening Sys.*, 2015 WL 2031007, at *11; *see also Drouillard v. Keister Williams Newspaper Servs., Inc.*, 423 S.E.2d 324, 326-27 (N.C. App. Ct. 1992) (finding violations of the trade secrets protection act sufficient to allege a violation of the UDTPA); *United Labs*, 370 S.E.2d at 389 (finding tortious interference with contract may satisfy a violation of the UDTPA); *Grout Dr. Glob. Franchise Corp. v. Groutman, Inc.*, No. 7:14-cv-105, 2015 WL 2353698, at *5 (E.D.N.C. May 15, 2015) ("Misappropriation of trade secrets constitutes an unfair or deceptive act or practice as a matter of law.").

Here, Taylor and Meherrin argue that because Nutrien's state and federal trade secret claims fail, so, too, does its UDTPA claim. Dkt. 11 at 20. However, as explained above, the misappropriation of trade secret claims survive. *See supra* Part I. Accordingly, under both North Carolina and federal case law finding that successfully pleading

misappropriation of trade secrets also carries a UDTPA claim, Counts Eight and Nine survive as to that theory of liability.[6]

Nutrien also sufficiently alleges that Taylor and Meherrin violated UDTPA with their actions surrounding the Millingport Road Property and the alleged thwarting of Nutrien's lease renewal. *See* Compl. ¶¶ 123, 128. Once again, Meherrin waived any challenges to Nutrien's UDTPA claims regarding the Millingport Road Property by failing to address those arguments in its briefing. *See* Dkts. 11, 15; *Global Impact Ministries, Inc.*, 2022 WL 801714, at *10 ("When the defendant fails to provide argument in its brief regarding why a court should dismiss the plaintiff's claim, the defendant is deemed to have waived that argument."); *Stocker*, 342 F. Supp. 2d at 413 (finding defendant waived an argument in its motion to dismiss because it "filed no brief" on that particular argument).

---

[6] And even if the Court did not find a violation of the trade secrets act, the Court would nevertheless find Nutrien states a UDTPA claim against Taylor and Meherrin because "substantial aggravating circumstances" accompanied Taylor's breach of contract. A breach of contract claim is only sufficient to allege a claim under the UDTPA when there are "substantial aggravating circumstances." *Turpin*, 933 S.E.2d at 685 (quoting SciGrip, 373 N.C. at 426, 838 S.E.2d 334). Substantial aggravating circumstances accompanying the breach often "include some element of deception." *Popper v. Hartford Fin. Servs. Grp., Inc.*, 682 F. Supp. 3d 469, 476 (E.D.N.C. 2023), aff'd, No. 23-1450, 2024 WL 773581 (4th Cir. Feb. 26, 2024) (collecting cases). There is no question Nutrien alleges that Taylor and Meherrin deceived them. Compl. ¶¶ 42-60. Nutrien alleges Taylor stole the Confidential Information and then wiped his Nutrien devices before returning them. *Id*. ¶¶ 57-59. And the Defendants failed to argue against Nutrien's claim that Taylor breached his contract with Nutrien. *See* Dkt. 11. Thus, Nutrien sufficiently alleges a UDTPA claim.

However, even if the Defendants had raised arguments against Nutrien's claims on this issue, they would still fail. As explained above, Taylor and Meherrin tortiously interfered with Nutrien's contractual relationship and expectation of renewal with the Millingport Road Property Landlord resulting in Nutrien losing certain investments made on the property. *See supra* Part II.C. Therefore, Taylor and Meherrin's actions were unfair and deceptive and the UDTPA claim can move forward. *See Intercollegiate Women's Lacrosse Coaches Ass'n v. Corrigan Sports Enters., Inc.*, 546 F. Supp. 3d 440, 455 (M.D.N.C. 2021) ("Tortious interference with contract claims may support unfair competition claims."); *Edmondson v. Am. Motorcycle Ass'n, Inc.*, 7 F. App'x 136, 152 (4th Cir. 2001) ("the Defendants' conduct in interfering with [Plaintiff's] contractual rights and *prospective contractual rights* when he was attempting to carry on his new business constitutes unfair competitive practice in or affecting commerce within the purview of § 75–1.1.") (emphasis added); *Sunbelt Rentals, Inc. v. Head & Engquist Eqip., L.L.C.*, 620 S.E.2d 222, 229 (N.C. App. Ct. 2005) (tortious interference with prospective advantage supports UDTPA claim).

Therefore, viewing all allegations in Nutrien's favor, Nutrien sufficiently alleged its UDTPA claim and the Court denies the Defendants' motions to dismiss for Counts Eight and Nine.

## V. Nutrien Has Sufficiently Pled Its Civil Conspiracy Claim (Count Ten) Against Taylor and Meherrin.

As evidenced by the Court's findings to this point, Nutrien has sufficiently pled an unlawful scheme between Taylor and Meherrin to support a civil conspiracy claim.

"The elements of a civil conspiracy are: (1) an agreement between two or more individuals; (2) to do an unlawful act or to do a lawful act in an unlawful way; (3) resulting in injury to plaintiff inflicted by one or more of the conspirators; and (4) pursuant to a common scheme." *Piraino Bros., LLC v. Atl. Fin. Grp., Inc.*, 712 S.E.2d 328, 333 (N.C. Ct. App. 2011) (citation omitted); *see also Henry v. Deen*, 310 S.E.2d 326, 334 (N.C. 1984). Furthermore, a plaintiff must also allege a commission of some "overt act" by a conspirator in furtherance of the conspiracy. *See Superior Performers, Inc. v. Thornton*, No 1:20-cv-123, 2021 WL 2156960, at *8 (M.D.N.C. May 27, 2021); *Shope v. Boyer*, 150 S.E.2d 771, 773-74 (N.C. 1966). However, it is well-settled that "there is not a separate civil action for civil conspiracy in North Carolina. Instead, civil conspiracy is premised on the underlying act." *See Piraino Bros., LLC*, 712 S.E.2d at 333 (citation and quotation omitted). The underlying claims must be "adequately pled." *See USA Trouser, S.A. de C.V. v. Williams*, 812 S.E.2d 373, 380 (N.C. Ct. App. 2018).

Here, Nutrien has alleged each of the elements of a civil conspiracy. Nutrien has sufficiently asserted that Taylor and Meherrin[7] colluded to effectuate a scheme that would unjustly enrich Meherrin and undermine Nutrien's business. Nutrien has alleged that Meherrin and Taylor colluded and agreed (1) to use and disclose Nutrien's Confidential Information as part of a scheme to take business from Nutrien, (2) to obtain the

[7] Although not included as a Defendant, Nutrien does also allege that Morgan was part of the unlawful scheme. *See* Compl. ¶¶ 41, 132.

Millingport Road Property and Nutrien's property therein for Meherrin's benefit, (3) to assist Meherrin in poaching multiple Nutrien employees, and (4) to use Nutrien's Confidential Information to further Meherrin's business interests and harm Nutrien. Compl. ¶ 131. Nutrien also alleges concrete, overt acts consistent with such a conspiracy. As one example, six days before he resigned from Nutrien, Taylor downloaded a copy of a Nutrien spreadsheet entitled "2025 Default Price List and Info.xlsx." *See id*. ¶ 51. Nutrien alleges that Meherrin used that list to undercut Nutrien's prices for a potential customer. *Id*. ¶ 51. Due to all of this, Nutrien alleges, it has suffered damages. *Id.* ¶ 134. Therefore, Nutrien has adequately pled civil conspiracy.

The Defendants argue that Nutrien's allegations of civil conspiracy rely on the same facts to establish both the underlying tort and the conspiracy to commit that tort. Dkt. 11 at 24-25. It is true that generally "a plaintiff cannot use the same facts to form both the basis for a claim for conspiracy to commit certain torts and the basis for claims based on the underlying tort." *Thornton*, 2021 WL 2156960, at *8 (internal citations omitted). "But, as a general rule, both North Carolina and the federal rules permit a plaintiff to plead alternative theories of recovery based on the same conduct and later make an election of remedies." *Jacobs Vehicle Sys., Inc. v. Yang*, No. 1:12-cv-181, 2013 WL 4833058, at *11 (M.D.N.C. Sept. 10, 2013); *see also Stanley v. Moore*, 454 S.E.2d 225, 229 (N.C. 1995); Fed. R. Civ. P. 8(d)(2). This is particularly important at the motion to dismiss stage. *See Norman v. Nash Johnson & Sons' Farms, Inc.*, 537 S.E.2d 248, 265 (N.C. App. Ct. 2000)

(denying motion to dismiss civil conspiracy claim because the elements were sufficiently pled even though the facts alleged were the same as the underlying tort and distinguishing the analysis of such claims at a summary judgment stage as opposed to a Rule 12(b)(6) stage). Because Nutrien sufficiently pled civil conspiracy, at this stage, the Court will allow Count Ten to move forward as a potential alternative theory of recovery.

Therefore, the Defendants' motion to dismiss Count Ten is denied.

**CONCLUSION**

It is therefore **ORDERED** that the Defendants' motion to dismiss Count Five is **GRANTED** and its motion to dismiss Counts Two, Three, Four, Six, Seven, Eight, Nine, and Ten is **DENIED**.

It is SO ORDERED.

This the 30th day of September, 2026.

LINDSEY A. FREEMAN
UNITED STATES DISTRICT JUDGE